***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before former Deputy Commissioner Jones. The parties have shown good grounds to reconsider the evidence; therefore, the Full Commission MODIFIES and AFFIRMS the Opinion and Award of the former Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant-employer.
3. Zurich American Insurance Company was the carrier on risk.
4. Wage and earnings information was submitted from which an average weekly wage may be determined.
5. Plaintiff's medical records were stipulated into evidence as Stipulated Exhibit 1.
6. Industrial Commission Forms and filings as well as discovery and personnel information were stipulated into evidence as Stipulated Exhibit 2.
7. The issues before the Full Commission are: (i) whether North Carolina Industrial Commission has jurisdiction in this claim; (ii) whether plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer with defendant-employer; and (iii) if so, what compensation, if any, is due plaintiff?
8. The depositions of Harlan B. Daubert, M.D., Kevin J. Rickwartz, M.D., and Robert D. Rosen, M.D are a part of the evidentiary record in this case.
 ***********
Based upon the evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Defendant-employer maintains a satellite trucking terminal in Greensboro, North Carolina with similar terminals in Pennsylvania and Georgia. The North Carolina terminal consists of an office and lot with storage capacity for a minimum of fifteen tractors and twenty-two trailers. At the time of plaintiff's hiring, Brenda Thornburg, fleet manager, and her assistant were responsible for managing and addressing all issues concerning the ninety-eight (98) North Carolina drivers working out of the Greensboro terminal. The fleet manager's duties also encompassed truck driver recruitment and hiring including providing employment applications and conducting interviews for these positions.
2. Plaintiff was a re-hire. Plaintiff had previously been employed by defendant-employer and was previously hired in Greensboro. During the rehiring process, plaintiff completed the employment application in Greensboro which was later sent to Pennsylvania. Fleet manager, Ms. Thornburg, was required to interview plaintiff to determine his employment suitability, assist him with his application, and if plaintiff passed the Department of Transportation test, forward the paperwork to Pennsylvania for completion.
3. While plaintiff did not perform the majority of his duties in any one state, plaintiff did have significant contacts with North Carolina regarding his employment. Plaintiff received his paychecks at his residence in North Carolina. Plaintiff submitted his application and was approved by the fleet manager in North Carolina. Plaintiff regularly communicated any employment related or payroll issues with the fleet manager who was located in North Carolina. The terminal from which plaintiff was working was located in North Carolina. Plaintiff's first pickups and last deliveries were scheduled near his North Carolina residence to reduce the frequency of plaintiff driving an empty truck. Plaintiff kept his vehicle at his residence when not driving. When plaintiff kept his truck at home, it was usually loaded in order to reduce the frequency of driving with an empty truck, thus benefiting defendant-employer. Plaintiff would leave his truck at the Greensboro terminal if he was not keeping his truck at home when not in use.
4. Plaintiff was recruited and hired from within North Carolina. Hugh T. Wallace, M.D, conducted plaintiff's United States Department of Transportation physical examination in North Carolina. Plaintiff performed a driver's test in North Carolina and the mileage rate acknowledgement indicated plaintiff was a new hire and had completed the appropriate testing in North Carolina on May 29, 2001.
5. Plaintiff's contract of employment was made in North Carolina, and plaintiff's principal place of employment was within North Carolina; therefore, the North Carolina Industrial Commission has jurisdiction of this matter.
6. On May 31, 2001, plaintiff executed a driver work agreement and had tests performed that were approved by defendant-employer's fleet manager at the North Carolina terminal. Plaintiff's employment relationship with defendant-employer was established on May 31, 2001 when he had agreed to a pay scale and drove a truck with a load certified to the North Carolina Department of Justice out of North Carolina for defendant-employer.
7. On January 1, 2002, plaintiff was driving a tractor-trailer truck and switching trailers within the scope of his employment at the Hershey warehouse facility in Salt Lake City, Utah. When plaintiff exited from the tractor cab, he slipped on ice and hit his tailbone.
8. Plaintiff immediately experienced back pain following his slip on the ice and stopped working for approximately ten minutes to allow the pain to subside. After allowing time for the pain to subside, plaintiff continued his efforts to switch the trailers. Plaintiff did not think he had seriously injured himself at the time of his accident and continued to work for defendant-employer for two to three days afterward.
9. The pain resulting from plaintiff's slip on the ice on January 1, 2002 did not go away as plaintiff had expected. Plaintiff continued experiencing stinging back pain whenever he drove over a hole or the truck was jarred.
10. Plaintiff did not immediately contact defendant-employer to indicate the accident had occurred because he believed the pain would subside. However, on January 5, 2002 plaintiff's pain began to increase and continued for the next two days.
11. On January 7, 2002, plaintiff arose from his bunk in the tractor cab and upon standing he experienced severe pain in his low back which at the time he thought was kidney stones. The back pain was very severe and plaintiff doubled over and needed another driver to assist him into a truck stop to call a dispatcher to pick up the loaded trailer.
12. Plaintiff then attempted to contact his primary care physician, Dr. Robert Rosen. The office manager at the Ardmore Family Practice took plaintiff's call and told him to seek care at an Urgent Care or Emergency Department.
13. On January 7, 2002, plaintiff arrived at Northwest Texas Healthcare Emergency Department and was examined by Dr. Kevin J. Rickwartz. Dr. Rickwartz determined plaintiff had a lumbar strain and left sciatica and discharged him with Lortab and Flexeril. Dr. Rickwartz took plaintiff out of work from January 1, 2002 through June 10, 2002 and instructed him to return to his primary care physician.
14. Michael Hikes, defendant-employer's Claims Manager, interviewed plaintiff on January 9, 2002. Plaintiff indicated he was uncertain as to exactly what the cause of his pain was and stated he did not know whether it was kidney stones, muscles, or other problems.
15. Mr. Hikes, defendant-employer's Claims Manager, is experienced in taking statements regarding on the job injuries. In his interview with plaintiff, Mr. Hikes did not ask about the severity of plaintiff's accident nor did he get specific details about what had actually occurred on January 1, 2002.
16. Plaintiff presented to his primary care physician, Dr. Robert Rosen, on January 11, 2002. Plaintiff relayed the details of his accident in Salt Lake City to Dr. Rosen. After physical examination, Dr. Rosen suspected plaintiff had a herniated disc in his lower back. An MRI of plaintiff's back indicated plaintiff had a nerve impingement at L5-S1 and disc protrusions at L4-5.
17. There have been discrepancies in regards to dates and facts in Dr. Rosen's medical documentation. Dr. Rosen indicated other individuals in his practice answered all telephone calls and telephone call inquiries are not as significant or critical as office visits.
18. Dr. Rosen verified in his deposition testimony that plaintiff indicated he had fallen on ice in Salt Lake City on January 1, 2002. Dr. Rosen also verified it was possible that his physician assistant or others may not have properly documented the date of plaintiff's injury.
19. Dr. Rosen stated that the same injury for some patients may be immediately incapacitating; whereas, with other patients, the same injury could cause an inflammatory response that might become more painful several days later.
20. Dr. Rosen opined that plaintiff's condition including the herniated disc and all treatment that was obtained since the time of his injury in Salt Lake City were related to his work related injury on January 1, 2002.
21. Dr. Rosen referred plaintiff to an orthopedic surgeon, Dr. Harlan Daubert. Dr. Daubert testified that plaintiff related the facts concerning the slipping on the ice and falling on his buttocks and the small of his back in Salt Lake City on January 1, 2002. Dr. Daubert stated that it was not unusual for a patient to have a suspicion of kidney stones as a potential back problem when the medical condition was in fact a spinal or back problem.
22. On January 21, 2002, plaintiff visited a physician assistant with Orthopaedic Specialists of the Carolinas and was diagnosed with S1 nerve root radiculopathy.
23. Dr. Daubert examined plaintiff on February 22, 2002 and initially diagnosed him with a herniated disc at S1 with radiculopathy. Plaintiff received epidural steroid injections; however, these injections did not resolve plaintiff's symptoms.
24. On February 28, 2002, plaintiff underwent a myelogram which indicated a left side disc herniation at L4-5. Dr. Daubert opined that the plaintiff's January 1, 2002 back injury resulted in his herniated disc and could have aggravated his stenotic back condition.
25. On March 18, 2002, plaintiff underwent an unsuccessful L4-5 diskectomy and L5-S1 decompression and disk excision.
26. After unsuccessful physical therapy and epidural injections, plaintiff had an anterior/posterior spinal fusion with bone graft, pedicle screws, and a bilateral hemilaminectomy on October 14, 2002.
27. Dr. Daubert opined that plaintiff's 1976 decompression surgery was not related to plaintiff's current symptoms, and instead, plaintiff's current symptoms are the result of his January 1, 2002 accident. Consequently, following the October 14, 2002 surgery, Dr. Daubert gave plaintiff a twenty-five (25%) percent permanent partial disability rating for his back. Dr. Daubert also opined that all treatment plaintiff has received including surgeries, physical therapy, home exercise, and medications is related to plaintiff's fall in Salt Lake City and symptoms that developed as a result thereof.
28. Dr. Daubert feels that plaintiff should continue with physical therapy and that it will be a year before permanent work restrictions can be assigned and an attempt made to return plaintiff to a permanent position. Dr. Daubert is also doubtful that plaintiff will ever return to work as a truck driver.
29. Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer on January 1, 2002.
30. Plaintiff was continuously employed by defendant-employer from May 31, 2001 through January 7, 2002; thus, plaintiff's average weekly wage is fairly and justly calculated by dividing his earnings during this period, $28,724.39, by the actual number of weeks employed by defendant-employer prior to his release from work on January 7, 2002 which is 31.2857 weeks. Plaintiff's average weekly wage is therefore correctly calculated as $918.13.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The North Carolina Industrial Commission has jurisdiction in this matter in that plaintiff's contract of employment was made in North Carolina and plaintiff's principal place of employment was within the State of North Carolina. N.C.G.S. §§ 97-2; 97-36; Perkins v. ArkansasTrucking Services, Inc. 351 N.C. 634, 528 S.E.2d 902 (2000).
2. Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer on January 1, 2002. N.C.G.S. § 97-2(6).
3. As result of plaintiff's compensable injury by accident on January 1, 2002, plaintiff suffered a herniated disk at L4-5 and L5-S1 nerve impingement; S1 nerve root radiculopathy, and an aggravation of his spinal stenosis. Plaintiff had an L4-5 diskectomy and an L5-S1 decompression surgery that was unsuccessful that required an anterior/posterior spinal fusion with bone graft, pedicle screws, and a bilateral hemilaminectomy. Plaintiff is entitled to receive medical treatment for these conditions so long as such treatment will effect a cure, give relief, or lessen plaintiff's period of disability. N.C.G.S. § 97-25.
4. As a result of plaintiff's compensable injury by accident, plaintiff has been unable to return to work since January 7, 2002 and is entitled to ongoing total disability compensation until further order of the Commission. N.C.G.S. § 97-29.
5. As a result of plaintiff's compensable injury by accident, plaintiff has received a twenty-five (25%) percent permanent partial disability rating to his back. N.C.G.S. § 97-31.
6. As plaintiff's employment with defendant-employer extended over a period of less than fifty-two (52) weeks, the third method of computation of average weekly wage as prescribed by the Workers' Compensation Act provides results fair and just to both parties. Thus, plaintiff's average weekly wage is $918.13 resulting in a weekly compensation rate of $612.09. N.C.G.S. § 97-2(5).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission modifies and affirms the opinion of the former Deputy Commissioner and enters the following
 AWARD
1. Defendants shall pay plaintiff ongoing total disability compensation in the amount of $612.09 per week beginning January 7, 2002 and continuing until further order of the Commission. Said compensation that has accrued to date shall be paid in a lump sum. All compensation is subject to an attorney's fee approved in Paragraph 3.
2. Defendants shall pay all medical expenses resulting from plaintiff's compensable injury by accident on January 1, 2002.
3. A reasonable attorney's fee of twenty-five (25%) percent of compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiff's counsel and shall be paid as follows: twenty-five (25%) percent of lump sum due plaintiff under Paragraph 1 of this AWARD shall be deducted from that sum and paid directly to plaintiff's counsel. In regards to future compensation, plaintiff's counsel shall be entitled to the equivalent of every fourth check.
4. Defendants shall pay the costs.
This the ___ day of November 2003.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER